**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

ROGER ERVIN          *

Plaintiff          *

v          *      Civil Action No. ELH-16-3964

WEXFORD, *et al.*          *

Defendants          *
         ***

**MEMORANDUM OPINION**

This is a prisoner civil rights case. Roger Ervin, the self-represented plaintiff, is an inmate at the North Branch Correctional Institution ("NBCI"). He filed correspondence on December 8, 2016, construed as a complaint against Wexford Health Sources, Inc. ("Wexford"). ECF 1. Pursuant to a court Order (ECF 3), Ervin was directed to file an amended complaint and/or a Petition for Writ of Habeas Corpus. He filed an amended complaint on January 17, 2017 (ECF 5) against Mahboob Ashraf, M.D.; Robustiano Barrera, M.D.; Nurse Bill Beeman; Warden Frank Bishop; Lt. Sawyers; Sgt. G. Forney; Ofc. Amy Conner; and Ofc. S. Keel. On February 17, 2017, he sought to amend his suit. *See* ECF 16; *see also* ECF 31 (Order of April 11, 2017, denying amendment, in part).

On March 21, 2017, Ashaf, Barrera, Beeman, and Wexford ("Medical Defendants") filed a motion to dismiss or, in the alternative for summary judgment. ECF 25. It is supported by a memorandum (ECF 25-1) (collectively, "Medical Motion") and verified medical records of plaintiff. Ervin filed an opposition (ECF 32), along with exhibits.

On April 20, 2017, defendants Bishop, Conner, Forney, Keel, and Sawyers ("Correctional Defendants") filed a motion to dismiss or, in the alternative, for summary judgment (ECF 34), supported by a memorandum (ECF 34-1) and numerous exhibits. The

motion and the memorandum were subsequently supplemented. *See* ECF 42; ECF 42-1. I shall refer to ECF 34, ECF 34-1, ECF 42, and ECF 42-1 collectively as the "Correctional Motion."

During the pendency of the case, Ervin filed several motions for extensions of time in which to respond and for a stay. *See*, *e.g.*, ECF 12 (motion for extension); ECF 29 (motion for extension); ECF 35 (motion for extension); ECF 46 (motion for stay). I granted Ervin several extensions of time in which to respond. *See*, *e.g.*, ECF 31 (Order); ECF 37 (Order); ECF 52(Order).

Ervin also filed the Declaration of Leonard Waddell, a fellow inmate, and a "Motion To Withdraw Response To Summary Judgment. ECF 43. In addition, he filed correspondence as to his medical condition. *See* ECF 27; ECF 28.

Plaintiff sought another stay in submissions that were docketed on July 10, 2017 (ECF 55) and August 7, 2017. ECF 58. He also sought discovery. ECF 57. Those motions were granted in part and denied in part by Memorandum and Order of August 14, 2017. ECF 60 (Memorandum); ECF 61 (Order).

Among other things, the Memorandum (ECF 60) and Order (ECF 61) of August 14, 2017, required defendants to provide plaintiff with copies of relevant medical records; granted plaintiff 21 days from receipt of the records to file an opposition to defendants' Motion, and forewarned plaintiff that evidence of dilatory tactics would result in dismissal of the complaint, without addressing the merits of his claims, pursuant to Fed. R. of Civ. Proc. 41(b). ECF 60; ECF 61. In response to the Order, counsel for defendants filed a notice on August 31, 2017, advising that plaintiff was provided with a copy of his medical records for the period from August 16, 2016 to present. ECF 63.

Following receipt by plaintiff of his medical records, he filed two more motions. One requested an "Emergency Order, And Temporary Restraining Order" (ECF 64) and the other was titled "Second Emergency Order, And Temporary Restraining Order." ECF 65. Ervin also filed correspondence indicating an intent to file a motion for partial summary judgment (ECF 66); and a submission that was docketed as a motion for summary judgment, but it is actually titled "Notice Of An Intent To File Summary Judgment." ECF 67.

I will deny the motion to withdraw the opposition response. *See* ECF 43. Moreover, the documents and submissions filed by plaintiff will be considered collectively as his opposition to the dispositive motions.

No hearing is necessary to determine the multiple issues pending in this case. *See* Local Rule 105.6 (D. Md. 2016).

## I. Pending Non-Dispositive Motions

Plaintiff's emergency motions (ECF 64; ECF 65) allege a now familiar claim from plaintiff that it is impossible for him to receive appropriate medical care without his permanent transfer to Jessup Correctional Institution ("JCI"), pending surgery. In his first motion, plaintiff states he received glaucoma surgery to his left eye on June 21, 2017, at Bon Secours Hospital. ECF 64 at 1. Dr. Summerfield performed the surgery, which involved placement of a tube in plaintiff's eye to relieve pressure. *Id*. Following the surgery, plaintiff was moved to JCI, where he was given eye drops and was seen by Dr. Paul Goodman. *Id*. Goodman cleared plaintiff for transfer back to Western Correctional Institution ("WCI") and plaintiff asked Goodman for instructions on the use of the eye drops he was given. *Id*. On June 23, 2017, Dr. Barrera examined plaintiff at JCI and reassured him that he would obtain a copy of the instructions for use of the prescribed eye drops before plaintiff left for WCI. *Id*. at 2.

Upon plaintiff's return to WCI, plaintiff claims "all my medication was stopped because defendants said I was complaining about the treatment." ECF 64 at 2. Plaintiff states in his second emergency motion that the medication that was stopped was Tramadol, and Dr. Ashaf informed him on August 30, 2017, that the prescription was cancelled by Dr. Ava Joubert, Medical Director. ECF 65 at 2. He claims that Ashraf further advised that he should write to Joubert and tell her that the Tramadol was prescribed to him for migraines by a neurologist who evaluated him for that problem. *Id.*

Plaintiff claims that on August 23, 2017, he was seen by Dr. Goodman at WCI and informed that his left eye was "rejecting the tube" and that his eye was infected. ECF 64 at 2. Goodman ordered antibiotics and said he would contact Dr. Summerfield because plaintiff would need additional surgery. *Id.* Plaintiff states that he does not want Dr. Summerfield to perform the second surgery because he "messed up the first time." ECF 65 at 3. Further, he claims that he received no aftercare following his surgery because he believes "they . . . are trying to kill me." *Id.* at 4. He notes that as of August 31, 2017 (the date he signed the motion), he had not received the antibiotics ordered on August 23, 2017. *Id.* at 3.

The relief plaintiff seeks with these motions is a transfer to JCI until his second surgery takes place; removal of another inmate from administrative segregation, as he was helping plaintiff with legal pleadings;[1] and an order reinstating all of his medications. ECF 64 at 3; ECF 65 at 4. He also requests that he be kept apart from defendants Lt. Sawyer, Sgt. Forney, and Officer Conners, in order to prevent retaliatory actions prompted by this litigation. ECF 65 at 5.

---

[1] Plaintiff claims that Brandon Roberts, another inmate at NBCI, was helping him with drafting and reading legal pleadings, and Roberts was placed on administrative segregation in retaliation for providing plaintiff with assistance. ECF 64 at 2–3; ECF 65 at 5.

The issue of plaintiff's assignment to NBCI was previously addressed by this court in its Memorandum and Order of May 26, 2017, denying plaintiff's similar request for injunctive relief. ECF 51; ECF 52. At that time, plaintiff was seeking a transfer to JCI because prescribed medications did not accompany him during his transfer between prisons. *See* ECF 1; ECF 4; ECF 5; ECF 12. Plaintiff was awaiting sinus surgery as well as glaucoma surgery when he initially filed this action and claimed that the eye drops he was prescribed for the glaucoma were not sent with him when he was transferred for purposes of receiving sinus surgery. *Id*. Further, he claimed that failure to provide the eye drops endangered his vision and that he was in danger of dying if he developed a sinus infection because the infection could enter his brain through a hole in his eye. *Id*. Defendants were directed to show cause why plaintiff's request for injunctive relief should not be granted. ECF 13. They responded on March 16, 2017 (ECF 20, Correctional Defendants); ECF 21 (Medical Defendants), with exhibits. *Id.*

From those responses it was established that plaintiff did not make any of the medical staff aware of his concerns regarding missing medication during his stay at JCI for his sinus surgery. ECF 21-3 at 29. Plaintiff also declined cataract removal surgery and tube shunt insertion to his left eye when he arrived at JCI on February 22, 2017, because he did not believe he had healed enough from the sinus surgery. *Id*. at 18, 20.

The Medical Defendants have no authority to effect a transfer for plaintiff and the Correctional Defendants explained that, due to the nature of Ervin's criminal offense (first degree rape), for which plaintiff received a sentence of life plus 20 years consecutive he requires housing in a maximum security facility. ECF 20-1. The Correctional Defendants also explained that JCI is not a maximum security facility and is therefore inappropriate for plaintiff's institutional assignment. *Id*. The Correctional Defendants and the Medical Defendants also

provided detailed information regarding the procedures in place for insuring that prescribed medication accompanies inmates during temporary transfers, and explained that plaintiff's glaucoma medication was among the medications that he kept in his cell so that it was his responsibility to bring it with him. ECF 20-2; ECF 21-4.

After review of all the evidence presented by defendants and plaintiff's reply (ECF 16), this court observed in its Memorandum of May 26, 2017 (ECF 51 at 6):

> Plaintiff's concerns regarding his housing status, the safety of NBCI for a man of his age and health status, and the proximity in time of the sinus surgery with the eye surgery appear to be based on his subjective fears and remain unsupported by objective evidence. Such fears are not a cognizable basis for an extraordinary remedy such as a preliminary injunction.
>
> In light of the objective evidence provided by defendants, which establishes that plaintiff's life is not endangered by the delay in eye surgery, and at least a portion of the delay in providing plaintiff with the eye surgery, is due to his own decision to delay it, plaintiff's request for preliminary injunctive relief shall be denied.

A preliminary injunction is an "extraordinary and drastic remedy." *See Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). To obtain a preliminary injunction, a movant must demonstrate: 1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4) that an injunction is in the public interest. *See Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam).

Plaintiff's request for a transfer must again be denied. This court's role is not to override the expertise of correctional officials who determine where an inmate serving a lengthy sentence might best be housed. It is not the province of this court to determine how a particular prison

might be more beneficently operated; the expertise of prison officials must be given its due deference. *See Sandin v. Conner*, 515 U.S. 472, 482-83 (1995).

The request to remove another inmate from administrative segregation, based on a bald assertion that his placement was due to a retaliatory animus toward plaintiff, must also be denied. First, a claim of retaliation that is conclusory, like this one, is subject to dismissal on its face. *Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996) (conclusory allegations of retaliation insufficient to state claim), *judgment vacated on other grounds*, 525 U.S. 802 (1998). Further, plaintiff has no standing to raise such a claim on behalf of another inmate. "[A]t an irreducible minimum, Article III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 472 (1982) (citations and internal quotation marks omitted); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992).

Plaintiff's request for reinstatement of all medications must also be denied. His only allegation is that Dr. Joubert cancelled his Tramadol prescription. Just as this court will invariably decline invitations to engage in managing the prisons, absent extraordinary circumstances, so too will it decline this invitation to override decisions made by medical professionals without evidence that a constitutional violation underpins those decisions. "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d

841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir.1970)).  No exceptional circumstances are alleged.  The request for an order requiring reinstatement of all medications is therefore denied.

## II.  Factual Background

The claims raised by Ervin in his complaint, as supplemented, concern an allegation that on August 16, 2016, Ervin was transferred to JCI for a medical appointment and was not provided prescribed medication during his stay there; that the failure to provide medications on medical transfer trips is a pattern that demonstrates deliberate indifference to Ervin's serious medical needs; he was denied surgery for glaucoma; he was denied access to courts when his mail was not processed in a timely manner; correctional officers retaliated against him by generating fraudulent charges to place him on segregation on June 29, 2016; and correctional officers refused to honor medical orders.  ECF 5 & 16.[2]  Although the allegations are difficult to discern, each of plaintiff's claims to those claims is set forth below, followed by defendants' response.

### A.    *Access to Courts*

Plaintiff claims that he was prevented from sending legal mail out of the prison by Officer Conner, who he has named as a defendant in this action.  He specifically claims that he was prevented from filing an opposition in Civil Action ELH-15-2263, because Conner refused

---

[2]  Plaintiff filed a motion to amend complaint (ECF 16), seeking to add to the complaint claims that the Medical Defendants lied to this court in a prior civil suit and that he was unable to oppose the motion for summary judgment in that case due to being in the hospital.  *See Ervin v. Ottey, et al.*, Civil Action ELH-15-2263 (D. Md.).  The claims asserted in the prior civil suit were fully litigated.  Therefore, to the extent the motion to amend sought to add claims that were already litigated, this court denied the motion to amend in an Order of April 11, 2017.  *See* ECF 31.

to allow him to send his mail out and he did not have access to the library or legal materials. ECF 5.

The Correctional Defendants have provided a copy of the mail log for NBCI for the relevant time-period, which reflects that plaintiff sent mail to this court on several occasions. *See* ECF 34-4 at 12– 44 (NBCI Legal Mail Log). In addition, they rely on the docket in Civil Action ELH-15-2263, which reflects that plaintiff filed seven pleadings after defendants filed a motion to dismiss or for summary judgment. *See Ervin v. Ottey, et al.*, Civ. Action ELH-15-2263 at ECF 14, 15, 17, 19, 20, 22, and 24. Plaintiff sought and was granted extensions of time in which to file his opposition in that case, but he failed to do so. The case was closed on August 18, 2016, when this court granted defendants' motion for summary judgment. *See id.* ECF 27 (Memorandum); ECF 28 (Order). Defendants further provide documentation that plaintiff requested copies of cases through LASI[3] and checked materials out of the institutional library, in contradiction to plaintiff's allegations that he had no access to such materials or to the library. ECF 34-4 at 46 – 50.

> ### B.  Processing of Administrative Remedy Procedure Complaints

Plaintiff claims that on June 22, 2016, he filed an administrative remedy procedure ("ARP") against defendant Amy Conner because she would not send out his mail and "she was not the Tier Official on 2-A-tier nor was she the Sgt. of the building." ECF 5 at 5. Plaintiff states he spoke with Sgt. Thomas that day. Ervin described himself as "indigent" and stated that the mail he was attempting to send was going to court. *Id.*

---

[3] LASI or "Library Assistance to State Institutions" is a program that provides copies of legal materials to prisoners upon request. *See* ECF 34-5 (Declaration of Jeffrey Nines, indicating that while on lock down inmates in plaintiff's housing unit were provided legal materials through LASI requests).

The warden's response to the ARP indicated the complaint was without merit. ECF 5 at 5. Plaintiff later discovered that Conner's supervisor, Sgt. Forney, as well as Lt. Sawyer, did the investigation for the ARP. *Id.* Plaintiff claims that either Forney or Sawyer lied (it is not clear from the complaint) because no one came to interview plaintiff or his witnesses. *Id.* Plaintiff makes no other allegation regarding this ARP.

Plaintiff also filed an ARP regarding his housing unit because it lacked access to the library from June 1 through 28, 2016. ECF 5 at 5-6. He states that Forney asked him to "sign off" on the complaint. *Id.* at 5. Plaintiff states that on June 28, 2016, his housing unit was placed on lock-down status due to assaults by gang members and that "since then prison officials have continued to keep housing unit 2 building where the plaintiff is housed on lock-down thereby shuttering the law library and all other programs" only for that housing unit. *Id.* at 6. Further, Ervin claims that he then "made a complaint informing prison officials of multiple cases" he had pending in the courts, but "the Warden and his administration did nothing to assist" plaintiff. ECF 5 at 6.

The Correctional Defendants provided copies of plaintiff's ARPs with responses noted on the forms, and also provided a statement under oath indicating that, prior to filing this law suit, plaintiff did not complete the appeal process through the remainder of the administrative review. ECF 34-4 at 52 – 59; 62 – 73; 77 – 120; 125 – 144; ECF 34-6 (Declaration of Russell Neverdon, Sr., Executive Director of the IGO); ECF 34-7 (Declaration of Kristina Donnelly, Acting Deputy Director For Field Support Services).

The first ARP (NBCI-1025-16) was filed by plaintiff on May 11, 2016, and concerns his claim that he attempted to mail an oversized envelope on April 21, 2016, but Officer Conner sent it back to plaintiff because it failed to comply with policy. ECF 34-7 at 4 – 5. The ARP

complaint is not clearly stated, but the Warden's response indicates that plaintiff's complaint was about "the lack of access to courts due to [Officer Conner] not processing a money voucher for postage." *Id*. at 5. Although plaintiff claimed that Conner was antagonistic toward him, Conner claimed she did not remember the incident and that she had no problems with plaintiff. *Id*. The Warden dismissed the ARP as having no merit. *Id*.

Plaintiff appealed the dismissal to the Commissioner of Correction, claiming that Conner violated his First Amendment right of access to the courts by refusing to process legal mail. ECF 34-7 at 3 − 4. The Commissioner denied the appeal on the basis that plaintiff provided no additional evidence that Conner violated standards of conduct. *Id*. at 2.

In ARP NBCI-1465-16, filed by plaintiff on June 27, 2016, plaintiff reiterated that he had three civil cases pending and stated that his housing unit had been on lock down since the beginning of the month. ECF 34-4 at 55. Further, he asserted that there had been no access to the "SSB library or in-house library" since the beginning of the lock-down, and claimed that his "rights to library are still being denied." ECF 34-4 at 55 − 56. According to Ervin, other sections in the same building had been permitted to attend the in-house library. *Id*. at 56.

The Warden responded to this ARP on July 29, 2016, and explained that plaintiff's housing unit had been on "various degrees of secured status for approximately three weeks due to multiple serious inmate on inmate assault[s], to include multiple stabbings." *Id*. at 55. The Warden further stated that the lock-down status was for the safety of inmates and staff and that legal material at NBCI is provided through the LASI program or via written requests to the librarian. *Id*. Although plaintiff's August 5, 2016 appeal to the Commissioner is included, there is no indication as to the disposition of that appeal. *Id*. at 53 − 54. The case summary indicates that there is no such thing as a law library at NBCI. *Id*. at 58.

C.      *Retaliation – June 29, 2016 Disciplinary Charges*

Plaintiff claims that "prison officials retaliated and had [him] placed on disciplinary segregation around June 29, 2016 on fraudulent charges." ECF 5 at 6. He states he remained on disciplinary segregation for 42 days before he had a hearing. *Id*. According to Ervin, the hearing officer told him he would believe whatever the officers said happened and advised him to "take time served." *Id*. Further, he alleges that the hearing officer told him the warden would remove the charges from his file if he pled guilty and agreed to a disposition of time served. *Id*. at 7.

The notice of infraction dated June 29, 2016, describes the incident as follows, ECF 34-4 at 3:

> I, Officer S. Keel, was assigned to Housing Unit #2A-Wing on 6/29/2016. At approximately 7:05 a.m. I announced that a female was present on the tier and was conducting my initial count. As I finished the bottom tier and started up the steps I observed inmate Roger Ervin . . . who is the sole occupant of cell 2-A-34-S, watching me from his cell window. Upon arriving at the cell and looking in the window to verify that inmate Roger [Ervin] was present, alive and well, I observed him stroking his erect penis while standing at his toilet, facing me, and looking at me. I gave him a direct order to stop to which he did not comply with my order and continued to stroke his erect penis while continuing to look at me smiling. I informed inmate Ervin that he would be receiving an adjustment. Inmate Ervin was identified by personal recognition and the A-Wing Roster.

Plaintiff was placed on administrative segregation pending adjustment and charged with violating rules 119 and 400. *Id*. The adjustment hearing was held on August 9, 2016, at 9:00 a.m., twelve days after the notice of infraction was issued. Plaintiff pled guilty and received 30 days segregation and 30 days loss of good conduct credits. *Id*. at 7 – 8.

D.      *Medical Care*

Plaintiff claims that on August 16, 2016, he was told to "pack up for court," but he was transported instead to an appointment with Dr. Ileana Showalter (improperly referred to as Ileaua Showaithe in the complaint), an ear, nose, and throat ("E.N.T.") doctor at Mercy Hospital in

Baltimore. ECF 5 at 3. However, he claims his appointment was not until August 22, 2016, so he was "gone all that time without [his] medication because I was going to go & was to go right back." *Id.*

When plaintiff saw Dr. Showalter on August 22, 2016, he claims she ordered an MRI and told him that he did not have high blood pressure. *Id.* She added that "the other E.N.T. wouldn't have gave you surgery without noting that after & before surgery (in 2011)." *Id.* Further, he claims the doctor told him that "they lied to the Judge," apparently referring to plaintiff's prior case in this court. *Id.* When plaintiff asked why he kept passing out, Dr. Showalter allegedly told him it was due to "Never [sic, nerve] damage to his neck & lower back, two disc[s] out in your back, no [sic] anything between your back bones in your back!" *Id.* Plaintiff asked how Showalter knew this and she allegedly told him this information was from the neurologist's report and it was the reason the neurologist ordered an MRI of plaintiff's neck and lower back. *Id.* In addition, he claims that Showalter told him that his prescribed medication was for nerve damage and that the neurologist would not know how bad it was until he had the MRI. *Id.* She also said she ordered the MRI so Ervin could have surgery, and she wondered why it had not been sent to her. *Id.*

Plaintiff states he came back to the prison on August 23, 2016, and received this court's decision in his then-pending case. *Id.* He claims he passed out and that he had a "blood spill" and some of his paper work was thrown out. *Id.*

Ervin claims that he put in a sick call slip because "the right side of my body stopped working." ECF 5 at 3. He was seen by Dr. Mahboob Ashraf on September 20, 2016, and was told he did not have high blood pressure and that they may never know why plaintiff keeps passing out. *Id.* When plaintiff asked for an order for medical showers, front cuffing, single cell

assignment, and one-hour exercise, he claims Ashraf told him that the warden did not want such orders to be issued. *Id*. at 3 – 4.

In his second amended complaint (ECF 16), plaintiff claims that on February 10, 2017, he was seen by an eye doctor at NBCI, who told him that each day he went without glaucoma surgery he would lose more and more of his vision. *Id.* at 1.[4]  He claims the doctor also informed him that any vision loss that occurred would be irreparable. *Id*. Plaintiff alleges he "can't see at all sometimes," that he is "still passing out," and that his nose was still bleeding from recent sinus surgery. *Id*. at 1-2. According to Ervin, his inability to see anything at times is contrary to the eye doctor's statement that he would "only be not able to see out of the side of [his] left eye . . . ." *Id*. at 2. He claims "all this came about because they stop my medication for one whole year" and because when he is sent out of the institution for medical appointments he is not provided with his medication. *Id*.

In a "Status Report" filed by plaintiff on March 10, 2017 (ECF 19), plaintiff asserted that he had sinus surgery on January 24, 2017, at Mercy Hospital in Baltimore. *Id.* at 1. Dr. Ileana Showalter performed the three-hour surgery and advised plaintiff after the surgery that he would need to follow her directions carefully after the surgery. *Id*. Plaintiff was released to JCI on the same day. *Id.* He states that Dr. Showalter wanted him to take an antibiotic every six hours, along with the pain medication prescribed. *Id*. Plaintiff was given two of each pill prior to being sent back to the prison, but once he reached JCI he claims that he was told they would need to order the antibiotics and he would not be permitted to stay in the infirmary if the doctor did not order it. When plaintiff pointed out he would need to be in the infirmary in order to receive his

---

[4]  As noted, by Order of April 11, 2017 (ECF 31), I denied the motion to amend. However, the denial pertained to matters previously addressed in Ervin's earlier suit. I consider here those allegations that were not previously litigated.

medication every six hours, he claims he was told to go back to his cell and report if he had a problem. *Id.* Plaintiff was transferred back to WCI the following day, without the prescribed antibiotics or pain relievers. Plaintiff was transferred to NBCI on January 26, 2017, into a cell with a cellmate. He claims he had still not received the prescribed medication when he was sent back to NBCI. *Id.*

At NBCI, plaintiff asked a nurse who was making medication rounds on the housing unit about his antibiotics, and he was told that the medication was ordered at JCI, not at NBCI. ECF 19 at 2. The nurse advised plaintiff to "write them up" because "they" (staff at JCI) did not send the medication to NBCI and plaintiff should have been kept in the hospital or should have refused the surgery if he was going to end up being sent back to NBCI. *Id.* Plaintiff states that he finally received the antibiotics on January 29, 2017, the designated "stop date." *Id.*

According to Ervin, on February 22, 2017, he was called to "pack-up" so he could be taken to the hospital for his eye surgery. ECF 19 at 2. He responded that he was still bleeding, his face and throat were still swollen, and he was still unable to eat. *Id.* He claims that medical staff told him that he "cried to the Judge" and that they were "going to give [him] surgery." *Id.* Plaintiff replied: "[N]o, you're going to kill me, or try . . . ." *Id.* Plaintiff was transported to Bon Secours Hospital in Baltimore. *Id.*

Ervin alleges that on February 23, 2017, after arriving at the hospital, he told the eye doctor that his throat and ears were infected and the doctor interpreted those statements to mean that plaintiff was refusing the surgery. *Id.* Plaintiff confirmed he was refusing the surgery for that day and then asked if there was any medication that could be provided for his infection. *Id.* The doctor advised that plaintiff would need to have the matter addressed by medical providers after he is sent back to the prison where he was housed. Plaintiff claims that if he had he taken

the surgery with the infection, it would have spread to his eyes. *Id*. Further, he claims that the longer he goes without the eye surgery, the more of his sight he loses. *Id*. Plaintiff requests that this court order defendants to provide the eye surgery to him. *Id*. at 3. However, as noted, *infra*, plaintiff's request is now moot as he has received the surgery to his left eye. *See* ECF 38-1; ECF 59.

The Medical Defendants have provided verified medical records in support of their response. *See* ECF 25-2. With regard to plaintiff's claim that he suffered a back injury, they state that on August 23, 2016, plaintiff was evaluated by Keri Davis, R.N., after his E.N.T. appointment and, despite his claim that he fell and injured his back while at Mercy Hospital, plaintiff was in no apparent distress. *Id*. at 3-4; *see also* ECF 25-1 at 8. Plaintiff was seen again on August 31, 2016, by Dawn Hawk, R.N., for renewal of an order for a non-wool blanket and antifungal cream. ECF 25-2 at 5-6. Hawk noted that plaintiff's gait was normal and that he had no other problems, nor did he voice any other complaints. *Id*. Thus, the Medical Defendants maintain that there is no support in the records that plaintiff actually fell and injured his back, or that Beeman failed to seek a consultation with regard to the fall. ECF 25-1 at 9.

On September 7, 2016, plaintiff was seen by Marilyn Evans, R.N., for a complaint of a nosebleed. ECF 25-2 at 7-8. At the time he was seen, plaintiff had no active bleeding from his nose, was not in pain, and was not experiencing any changes in vision. *Id*. Despite the normal exam, Evans submitted a request for a single cell status for plaintiff. *Id*. Plaintiff also requested a renewal of his prescription for Tramadol (Ultram), prescribed for treatment of pain, but Evans noted that the prescription did not need to be renewed until November. *Id*. The request for a single cell assignment for plaintiff was denied on September 9, 2016, because there was no medical reason for the assignment. *Id*. at 10.

Plaintiff was seen by Ricki Moyer, R.N., on September 16, 2016. ECF 25-2 at 11-12. Ervin asked about a refill for a Neurontin prescription, which he receives for treatment of pain, as well as a consultation with a provider and surgery. *Id*. at 11. Moyer noted that plaintiff exhibited no signs of "acute distress" and "ambulates with a steady gait, up and down from exam table with ease." *Id*. After consulting with a doctor, Moyer noted that the decision to renew plaintiff's prescription for Neurontin would not be made until a CT scan was performed. *Id*. Moyer did not have any knowledge about plaintiff's surgery. *Id*.

Despite Moyer's reassurances, plaintiff continued to request pain medication and, on September 20, 2016, reported experiencing chronic pain in his back and legs. ECF 25-2 at 13-14. When he was seen by Stacie Mast, R.N., plaintiff walked into the medical unit without difficulty, was able to bend at the waist without difficulty, and could move all extremities with purpose. *Id*. at 13. At the time of this encounter, plaintiff was receiving Tramadol (50 mg twice a day) for pain. *Id*. Mast referred plaintiff to a provider for evaluation of his current pain medications. *Id*. On September 22, 2016, plaintiff was seen by Krista Bilak, NP, and he was prescribed Neurontin, in addition to the Tramadol he was already receiving. *Id*. at 15-16.

When plaintiff complained of severe headaches on October 11, 2016, Tammy Buser, RN referred him to a provider for a follow-up. ECF 25-2 at 17. Plaintiff was seen by Dr. Ashraf two days later. *Id*. at 19. Dr. Ashraf discussed the results of plaintiff's CT scan, which was performed on the recommendation of the ENT who examined plaintiff for possible surgical removal of suspected polyps in plaintiff's sinuses. *Id*. It showed that plaintiff had a "1.5 cm retension cyst in the left maxillary sinus." *Id*. Dr. Ashraf requested approval of plaintiff's sinus surgery. *Id*. at 19-20.

On October 25, 2016, plaintiff was seen by Krista Bilak, N.P. and was informed that an E.N.T. consult had been approved and an appointment date was pending. ECF 25-2 at 25-26. Plaintiff complained of headaches, reported they had increased in frequency, and told Bilak the headaches were mostly frontal. *Id*. at 25. Bilak noted that plaintiff suffers from chronic sinusitis and that the seasons were changing; she ordered seven days of Chlor-Trimeton[5] and Excedrin Migraine. *Id*.

A notation dated October 28, 2016, indicates that Dr. Ottey approved plaintiff for medical showers due to "multiple 'syncopal' episodes," but after a consultation it was established that there was no evidence of a medical issue. ECF 25-1 at 27. It was further noted that medical showers are not provided for nosebleeds. *Id*.[6]

Plaintiff had sinus surgery on January 26, 2017, for removal of the cyst. ECF 25-2 at 28-30; 43-44. The skilled care record following plaintiff's surgery indicates that plaintiff was not experiencing any adverse effects from the surgery at that time. *Id*. Plaintiff was also seen by Dr. Robustiano Barrera on January 26, 2017, the date he was discharged from the infirmary at WCI. ECF 25-2 at 43. Dr. Barrera noted that plaintiff was receiving Zithromax (antibiotic) from January 26 through 31, 2017. *Id*. Plaintiff was discharged because he did not have any medical complaints and the nasal packing had been removed 24 hours after the surgery was performed. *Id*. His condition on discharge was noted as "Improved." *Id*.

At a provider visit at NBCI on January 31, 2017, Nurse Krista Bilak noted that plaintiff reported finishing the antibiotics and he continued to use the prescribed nasal spray. *Id*. at 29.

---

[5] Chlor-Trimeton is an antihistamine used to relieve symptoms of allergy, hay fever, and the common cold. https://www.webmd.com/drugs/2/drug-12210/chlor-trimeton-oral/details.

[6] It is unclear why plaintiff was provided an order for medical showers for suspected fainting episodes.

Because plaintiff still had pain from the surgery, he was continued on Tylenol 3 for an additional seven days. *Id*. At this time his "chronic left eye spot blindness" was briefly discussed. *Id*. Bilak noted that plaintiff was overdue for a follow-up appointment with Dr. Summerfield for this issue, and she submitted a consultation request. *Id*. at 29.

Plaintiff was returned to the WCI infirmary on February 24, 2017, following a medical visit at which he declined eye surgery. ECF 25-2 at 45. Plaintiff was complaining of a sore throat and was advised to put in a sick call slip when he got back to NBCI. *Id*.

On February 27, 2017, plaintiff was seen by William Beeman, R.N., for a sore throat. ECF 25-2 at 32-33. He told Beeman he had refused eye surgery because he did not feel he was adequately healed from his sinus surgery. *Id*. Beeman ordered a referral to an E.N.T. because plaintiff stated that he wanted an antibiotic. *Id*. at 33.

On June 21, 2017, during the pendency of this case, plaintiff received the eye surgery needed to address the glaucoma in his left eye. *See* ECF 38-1 (April 21, 2017 Affidavit of William Beeman, R.N.); *see also* ECF 59 (Plaintiff's status report indicating surgery was performed on June 21, 2017). However, plaintiff complains that the prison medical director, Dr. Ava Joubert, "arbitrarily stopped" the eye drops that were prescribed. ECF 59 at 2. Moreover, he maintains that he learned from the neurologist that "there is a blockage somewhere in his system" and he needs an MRI of his neck and back to determine the problem. *Id*. at 3. He adds that his health is "very poor." *Id*.

### III.    Standard of Review

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See*

*Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 Fed Appx. 220, 222 (4th Cir. 2016) (per curiam). But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries*,

*Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 Fed. App'x 632, 638 (4th Cir. 2016); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f))

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for

discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted).  But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).  According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244-45 (internal citations omitted); *see also Putney,* 656 Fed. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008).  "This is especially true where, as here, the non-moving party is proceeding pro se."  *Putney*, 656 Fed. App'x at 638.

Plaintiff has not filed an affidavit under Rule 56(d).  He was provided with copies of medical records relevant to the time frame covered by the complaint.  Nor is there any indication that any additional materials would create a genuine issue of material fact.  I am satisfied that it is appropriate to address the defendants' motions as ones for summary judgment, as this will facilitate resolution of the case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

Moreover, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC,* 828 F.3d 208, 216 (4th Cir. 2016).

Thus, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

In sum, to avoid summary judgment, there must be a genuine dispute as to material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). In *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017), the Court said: "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."

## IV. Discussion

A.      *Access to Courts*

Prisoners have a constitutionally protected right of access to the courts. *See Bounds v. Smith*, 430 U. S. 817, 821 (1977). However, in *Lewis v. Casey*, 518 U. S. 343, 355 (1996), the Supreme Court said:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 355). "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis*, 518 U.S. at 349. Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts. *Id*. at 399.

In *Christopher v. Harbury*, 536 U.S. 403, 403 (2002), the Court characterized access-to-the-courts claims as being in one of two categories. *Id* at 413-14. The first, termed "forward looking claims," are cases where official action frustrates a plaintiff's ability to bring a suit at the present time. *Jennings v. City of Stillwater*, 383 F.3d 1199, 1208-09 (10th Cir. 2004). The second class, termed "backward looking claims," arise when a plaintiff alleges that a specific claim "cannot be tried (or tried with all the evidence) [because past official action] caused the loss or inadequate settlement of a meritorious case." *Id*. at 1209. In this way, the official action

is said to have "'rendered hollow [the plaintiff's] right to seek redress'" in the courts.  *Id*.

(quoting *Christopher*, 536 U.S. at 415 (brackets in original) (internal citations omitted)).

Whether the claim is forward or backward looking, a prisoner claiming he was denied

access to the courts must ultimately prove he suffered an actual injury by showing that the

defendant's acts hindered his ability to pursue a nonfrivolous legal claim.   Conclusory

allegations are not sufficient in this regard.  *See Wardell v. Duncan*, 470 F.3d 954, 959 (10th Cir.

2006) (denying access to court claim based on allegation that petition for a writ of certiorari had,

for unspecified reasons, been dismissed and where plaintiff did not even mention the point on

appeal).

The right of access to the courts is "ancillary to the underlying claim, without which a

plaintiff cannot have suffered injury by being shut out of court." *Christopher*, 536 U.S. at 415.

"[T]he predicate claim [must] be described well enough to apply the 'nonfrivolous' test and to

show the 'arguable' nature of the underlying claim is more than hope."  *Id*. at 416 (footnote

omitted).  A prisoner's right to access the courts does not include the right to present frivolous

claims.  *Lewis v. Casey*, 518 U.S. at 353 n.3.

Plaintiff's access to courts claim consists of his allegations that mail sent to this court was

improperly returned to him and he was denied access to legal materials because the library was

closed.  Absent from the numerous pleadings filed in this case is any indication from plaintiff as

to what was contained in the envelope he attempted to mail and how the failure to mail it

adversely impacted a viable claim.  In addition, plaintiff does not refute that he continued filing

pleadings in this court during the same time period as the alleged interference with his mail.

Even assuming that the package plaintiff attempted to mail was improperly withheld from

the outgoing mail, the claim fails.  While the interference by prison officials with certain types of

mail may state a constitutional claim, occasional incidents of delay or non-delivery of mail do not rise to a constitutional level. *Gardner v. Howard*, 109 F.3d 427, 430-31 (8th Cir. 1997); *Smith v. Mashner*, 899 F.2d 940, 944 (10th Cir. 1990). Absent any assertion by plaintiff that he suffered an actual injury (such as a missed legal deadline), the allegation simply does not state a claim upon which relief may be granted.

Plaintiff does not refute defendants' assertion that he was provided legal materials during the time frame referenced; that the library's closure was necessitated by valid security concerns (*i.e.*, inmate stabbings); and that legal material at NBCI is provided through the LASI program or via written requests to the librarian, not through attendance at the library. Additionally, and perhaps most important, plaintiff has not offered information or evidence of harm in regard to his claim of denial of access to legal materials or during the processing of his administrative remedy complaints.

Rather, plaintiff's assertion appears to be that closure of the library and failure to accommodate him when he informed prison officials that he had three open cases are enough to establish a constitutional claim. Prison library attendance, however, is not so elevated a right as plaintiff might have this court conclude. Having open and active cases in the courts does not imbue plaintiff, or any other prisoner, with an absolute right to peruse the library for materials relevant to those pending matters. Where, as here, reasonable alternatives were provided while the library was closed, plaintiff sought (and was granted) numerous extensions of time, and there is no discernible injury resulting from the library's closure, plaintiff's constitutional right of access to the courts remains intact.

B.       Retaliation

Plaintiff alleges that the disciplinary charges against him, charging him with masturbating in front of a female correctional officer, was retaliatory.  To make out a prima facie case of retaliation, a plaintiff must allege that the retaliation for the exercise of protected conduct was the "substantial" or "motivating" factor behind the conduct of defendants. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  In the prison context, plaintiff must ultimately establish that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not narrowly tailored to achieve such goals. *Rizzo v. Dawson*, 778 F.2d 527, 532 & n. 4 (9th Cir.1985). The preservation of internal order and discipline constitutes a legitimate goal of the correctional institution. *Id*. at 532.

Ervin posits a bald allegation, without any factual basis, that the notice of infraction was an act of retaliation.  "A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone." *Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996) (*judgment vacated on other grounds*, 525 U.S. 802 (1998) (conclusory allegations of retaliation insufficient to state claim).  This claim is subject to dismissal.

C.       Eighth Amendment Claim

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendant or the failure to act amounted to deliberate indifference to a serious medical

need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.[7]

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *King*, 825 F.3d at 219. A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)); *see Scinto*, 841 F.3d at 228. And, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Proof of an objectively serious medical condition does not end the inquiry. The subjective component requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson*

---

[7] Recently, the Fourth Circuit observed that "not all Eighth Amendment violations are the same: some constitute 'deliberate indifference,' while others constitute 'excessive force.'" *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986)). In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to render medical assistance. *See Farmer*, 511 U.S. at 834; *Wilson*, 501 U.S. at 303; *Thompson*, 878 F.3d at 97. The deliberate indifference standard consists of a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98 (quoting *Farmer*, 511 U.S. at 834, 837-38). Conversely, in excessive force cases, "courts must determine 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Thompson*, 878 F.3d at 98 (quoting *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992)).

*v. Seiter*, 501 U.S. 294, 298 (1991); *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225. Put another way, "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178.

The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001). As the *Farmer* Court explained, 511 U.S. at 837, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Thus, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Notably, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986). What the Court said in *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999), is apt here: "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it . . . [T]he Constitution is designed to

deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments."

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842).

Moreover, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105. In *Scinto*, 841 F.3d at 226, the Fourth Circuit said:

> A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it . . . ." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842). Similarly, a prison official"'s "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

However, even if the requisite subjective knowledge is established, an official may still avoid liability if he "responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844; *see Scinto*, 841 F.3d at 226. Reasonableness of the actions

taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Notably, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added). Thus, inmates do not have a constitutional right to the treatment of their choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2nd Cir. 1986). And, disagreements between an inmate and medical staff as to the need for or the appropriate extent of medical treatment do not give rise to a constitutional injury. *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)); *see also Fleming v. LeFevere*, 423 F.Supp.2d 1064, 1070-71 (C.D. Cal. 2006).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference". *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (Actions inconsistent with an effort to hide a serious medical condition, refutes presence of doctor's subjective knowledge).

Plaintiff had two conditions that required surgical intervention; he received surgery for both. The manner in which medical services were delivered to plaintiff, which necessitated his transport to another prison prior to surgery and involved a number of consultations and tests, may have been less than ideal, but it does not constitute a reckless disregard for plaintiff's health

and safety, nor did it cause needless suffering. The verified, objective medical records, which plaintiff has not refuted, offer no support for plaintiff's claims that he was denied post-operative care after his sinus surgery or that he suffered an infection that endangered his life.

The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir.1977). Plaintiff was provided access to his medical records by order of this court, but has provided nothing by way of opposition that suggests the records submitted by defendants are somehow incomplete or do not depict the events accurately.

Plaintiff's other complaints regarding a back injury, nosebleeds, and mysterious fainting spells have all been documented in his medical record and attempts at addressing each have been made.[8] The fainting spells plaintiff reports, however, cannot be confirmed as they have never been witnessed by a third party. Likewise, plaintiff exhibits no objective symptoms that indicate he suffered the back injury he claims he sustained. Indeed, many of plaintiff's allegations rely on reported conversations he claims to have had with doctors that have little to no indicia of credibility. His assertion that an ENT specialist told him he had nerve damage to his back and that it was the cause of his fainting spells is an example of one such allegation. It strains the imagination to explain why such a specialist might offer a diagnosis of plaintiff's back or spine and then pinpoint that alleged injury as the cause of unconfirmed fainting spells when nothing about the consultation was related to those complaints.

---

[8] Plaintiff's nosebleeds appear to have been attributed to the polyps in his sinus that were removed.

In short, plaintiff has offered no credible evidence to support his claims that he has been mistreated, that medical staff are trying to kill him, or that he has received constitutionally inadequate medical care.

### V.      Conclusion

The Medical Defendants and the Correctional defendants are entitled to judgment in their favor on all of the claims asserted.   Plaintiff's motions to withdraw response to summary judgment (ECF 43) and motions for emergency orders (ECF 64, 65) and for summary judgment (ECF 67) shall be denied.  A separate Order follows.


<u>February 1, 2018</u>                              _____/s/_____
Date                                                         Ellen L. Hollander
                                                               United States District Judge